Irene **TOWNSEND, on behalf of herself and all other present and former employees of Mercy Hospital of Pittsburgh, similarly situated; Deborah Beck, Plaintiffs,**

v.

The **MERCY HOSPITAL OF PITTSBURGH, Defendant.**

**Civ. A. No. 86–651.**

United States District Court, W.D. Pennsylvania.

March 2, 1988.

E.J. Strassburger, Strassburger McKenna Gutnick & Potter, James Thomas, Jr., Pittsburgh, Pa., for plaintiffs.

John C. Unkovic, C. Arthur Dimond, Reed Smith Shaw & McClay, Cynthia C. Maleski, Pittsburgh, Pa., for defendant.

## MEMORANDUM ORDER

BLOCH, District Judge.

On January 16, 1987, this action was referred to Chief United States Magistrate Ila Jeanne Sensenich for report and recommendation on pending motions for summary judgment in accordance with the Magistrates Act, 28 U.S.C. Section 636(b)(1)(B),

and Rule 4 of the Local Rules for Magistrates.

The magistrate's report and recommendation, filed on February 10, 1988, recommended that plaintiff's motion for partial summary judgment be denied and that defendant's motion for summary judgment be granted. The parties were allowed ten (10) days from the date of service to file objections. Service was made on all parties. Objections were filed by plaintiffs on February 17, 1988 and on February 24, 1988, defendant filed a response to the plaintiff's objections. After *de novo* review of the pleadings and documents in the case, together with the report and recommendation and objections thereto, the following order is entered:

AND NOW, this 2nd day of March, 1988;

IT IS HEREBY ORDERED that plaintiffs' motion for partial summary judgment is denied and that defendant's motion for summary judgment is granted.

The report and recommendation of Chief Magistrate Sensenich, dated February 10, 1988, is adopted as the opinion of the court.

### MAGISTRATE'S REPORT AND RECOMMENDATION

ILA JEANNE SENSENICH, Chief United States Magistrate.

## I. RECOMMENDATION

It is recommended that plaintiffs' motion for partial summary judgment be denied and that defendant's motion for summary judgment be granted.

## II. REPORT

The plaintiffs, operating room technicians and nurses, now or formerly employed by defendant, The Mercy Hospital of Pittsburgh, bring this action to recover unpaid overtime compensation pursuant to the Fair Labor Standards Act, 29 U.S.C. Section 216(b). Plaintiffs claim that defendant is violating the Act by failing to pay them, during their nighttime shift (referred to as "on-premises-on-call"), 1½ times the hourly wage they make during their daytime shifts. Instead, during their "on-premises-on-call" shifts they are paid 1½ times the minimum wage unless they are actually called to perform duties, in which case they are paid 1½ times their daytime hourly wage during the time they are actually working. During their "on-premises-on-call" shift, during the time they are receiving 1½ the minimum wage, they have no assigned duties. Their official status is that they are to be available to be called to duty if the need arises. No surgery is scheduled during these shifts and the employees are free to read, sleep or pursue whatever other reasonable, non-job related activity they desire. The hospital provides rooms on the premises near the operating rooms for their use. The rooms contain beds, televisions, chairs, and toilet facilities.

Plaintiffs argue that by paying them 1½ times the minimum wage rather than 1½ times the rate they receive for working during the daylight shifts, the defendant violates 29 U.S.C. Section 207(a)(1) which provides:

(1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

Defendant, however, replies that the two different rates are authorized by 29 U.S.C. Section 207(g)(2) which provides as follows:

(g) Employment at piece rates

No employer shall be deemed to have violated subsection (a) of this section by employing any employee for a workweek in excess of the maximum workweek applicable to such employee under such subsection if, pursuant to an agreement or understanding arrived at between the employer and the employee before performance of the work, the amount paid to the employee for the number of hours

worked by him in such workweek in excess of the maximum workweek applicable to such employee under such subsection—

. . . .

(2) in the case of an employee performing two or more kinds of work for which different hourly or piece rates have been established, is computed at rates not less than one and one-half times such bona fide rates applicable to the same work when performed during nonovertime hours;

Plaintiffs argue that in order to base the rate of pay for non-productive "on-premises-on-call" shifts upon the minimum wage, the defendant would have to pay them the minimum wage for periods during their daylight shifts when they are resting between duties. The defendant replies that the insignificant occasions when plaintiffs rest between duties during their daylight hours are not equivalent to their "on-premises-on-call" shifts and cites in support of its position Opinion Letter No. 1125 (September 15, 1970) of the Wage–Hour Administrator, a copy of which is attached as Exhibit "A" to defendant's brief in support of its motion for summary judgment. In that Opinion Letter the administrator advised that hospital laboratory technicians could be compensated for standby or on-call time at any rate which was not less than the applicable minimum wage, although the actual productive laboratory work had to be paid for at the same rate applicable to the normal day shift. Plaintiffs note that the Opinion Letter is not binding in this court, citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 137, 139–40, 65 S.Ct. 161, 163–64, 89 L.Ed. 124 (1944). However, in that case the Court specifically stated:

We consider that the rulings, interpretations and opinions of the administrator under this act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

Therefore, although the Opinion Letter is not binding, this court can consider it for guidance.

The cases cited by plaintiffs are not helpful since they merely held that employees are required to be compensated for time "on-call." They did not address the issue as to the rate the employees had to be paid. *Skidmore v. Swift & Co., supra; Brock v. DeWitt*, 633 F.Supp. 892 (W.D.Mo.1986); *Armour and Co. v. Wantock*, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118 (1944); *Campbell v. Jones & Laughlin Steel Corp.*, 96 F.Supp. 189 (W.D.Pa.1951). In this case plaintiffs are paid 1½ times the minimum wage during their non-productive "on-premises-on-call" shifts and they are paid 1½ times their daylight wage when they are actually assigned duties. For instance, when they are assigned duties during their "on-premises-on-call" shifts, the duties are the same as those performed during their other shifts. The defendant cites cases in support of its position that it can pay a lower rate for work which is different from an employee's regular duties. *McCrary v. Weyerhaeuser Co.*, 457 F.2d 862 (9th Cir. 1972); *Hodgson v. Penn Packing Co.*, 335 F.Supp. 1015 (E.D.Pa.1971). The critical question appears to be whether plaintiffs' non-productive "on-premises-on-call" shifts involved the same work as their daylight shifts. Plaintiffs argue that it does because when they are actually called to work they perform the same duties they perform during their daylight shifts. However, during the time they are performing those duties they are paid 1½ times the rate they receive during their daylight shift. It is only when they are engaged in no duties and are merely "available" that they receive 1½ times the minimum wage. It appears to the magistrate that the duties they perform during their non-productive "on-premises-on-call" shifts is substantially different from their duties during their daylight shifts. They are simply being

paid for being available which would justify a lower rate than when they are actually performing duties for which they have specialized training.

Plaintiffs argue that there are times during their daylight shifts when they are not actively working but are merely waiting to be assigned duties and therefore, are in the same status as their non-productive "on-premises-on-call" shifts and that since they receive their regular compensation for these times, rather than the minimum wage, they are entitled to 1½ times that wage during their "on-premises-on-call" shifts. However, review of the exhibits they refer to does not support their claim that their duties during non-productive times in their daylight shifts are similar to their duties during their non-productive times during their "on-premises-on-call" shifts. Plaintiffs refer to the deposition of Janet Routh, pages 41 and 43–44. She testified as follows:

Q. There are times, I presume, when there is more manpower than procedures needing that manpower?

A. Yes, sir, sometimes.

(Tr. 41).

A. We always maintain one operating room for emergencies, yes, sir.

Q. And you maintain a technician and a nurse to cover that operating room?

A. Yes, sir.

Q. What is that technician and nurse doing?

A. When?

Q. Waiting?

A. Waiting, relieving for coffee breaks, picking up surgical instruments, relieving for lunch.

Q. Maybe sitting reading a magazine?

A. *Not usually, they are usually busy, they take their break, they usually are assigned duties.*

(Tr. 43) (Emphasis added.)

Q. At some points of the day there may be five or six techs, five or six nurses who have no procedures in their operating room; is that correct?

A. That could happen.

Q. And there may not be enough work at that time for everyone, I mean there may be a slow time, people may be around drinking coffee and chatting?

A. Yes, sir, *that's a rare occurrence.*

Q. It's a rare occurrence for that many people not to have procedures?

A. Yes, sir.

Q. But it's not a rare occurrence for one or two nurses or techs not to be busy?

A. I don't understand. *They are assigned duties and they are usually kept busy the forty hours.*

Q. But if it's a slow period, there may not be enough work for everyone to do?

A. That's true there is a lounge area where they go.

Q. They are paid for that time?

A. Yes sir.

Q. At their regular rate?

A. Yes sir.

(Tr. 44) (Emphasis added.) Plaintiffs also refer to the deposition of Susan M. Salera.

Q. There are times when there are very few suites operating; is that right?

A. Yes.

Q. What are the nurses doing at that time?

A. Well, you should be stocking your room, cleaning, that type of thing.

Q. There are times when there is nothing to do; is that right?

A. *There is always something to do in the OR.*

Q. When there is one operating room, one suite going, there are sometimes nurses standing around having coffee or sitting in the lounge, are there not?

A. Oh, sure.

Q. You get paid for that, don't you?

A. Yes.

Q. At your regular rate?

A. Yes.

(Tr. 11–12) (Emphasis added.) Plaintiffs also cite page 24 of the Townsend deposition but it contains no discussion of "waiting time" during the daylight shifts. Plaintiffs also refer to the deposition of Robert Zomok.

Q. Waiting time while the employee was on a daylight shift, how was that compensated?

A. We didn't have any employees for waiting time on a daylight shift.

Q. Are you telling me that employees would not be standing around waiting for an ambulance to come into the hospital waiting for a surgery to take place?

A. They should not have been.

Q. There is 100 percent utilization of employees in the operating room theater for all hours of the day other than the on-premises on-call shift?

A. Well, certainly not 100 percent I am sure. I mean people do have to go to the bathroom and they do go to lunch.

Q. And they do stand around and chat for five, ten minutes, have a cup of coffee, sit in the lounge? Those are all activities that can be seen on an almost daily basis in the operating room theater?

A. But on a minimum basis.

Q. On a reduced basis; is that correct?

A. On a minimum basis.

(Tr. 33–34).

Q. During that regular hourly shift, if an employee was not occupied with a surgery, if an employee was waiting for a surgical case that had been called in, perhaps on an emergency, perhaps an ambulance was on the way to the hospital and an employee was standing by for a surgery, was that employee allowed to watch television?

A. No.

Q. Was there any time comparable to the time during the on-premises on-call shift, was there any daylight regular shift time that was comparable to that on-call time?

A. No sir.

Q. So you cannot tell me or cannot point for me to any time during the daylight shift when an operating room employee was paid either minimum wage or time and a half times minimum wage for watching television?

A. The employee was not permitted to watch television during regularly scheduled shifts.

. . .

A. To clarify so that I'm sure I understand, when an employee was scheduled to work a regular shift, they were not permitted to sleep during that regular shift, they were not permitted to watch television as part of being there.

Q. They were at times permitted to sit or stand in the lounge or at the nursing station and talk to each other and have a cup of coffee?

A. But that was generally minimal.

(Tr. 35–36). The exhibits referred to by plaintiffs do not support their argument that there were times during the daylight shifts when employees were engaged in a fashion similar to their "on-premises-on-call" shifts. They were generally assigned duties during their eight hour shifts and had merely the normal breaks available in most jobs for meals, coffee breaks, and other brief interludes between engaging in different duties.

During oral argument, counsel for plaintiffs introduced a new argument. He asked this court to compare plaintiffs' duties during their "on-premises-on-call" shifts with their duties during the 3:00 p.m. to 11:00 p.m. shift, Monday through Friday, when surgery is not regularly scheduled. During this shift, the technicians and nurses are paid their regular daylight rates. However, review of the record reveals that their duties during this shift are not similar to their duties during the non-productive "on-premises-on-call" shifts. During oral argument the parties were told they would be allowed until February 3, 1988, to advise the court of any citations to the record to support their positions. On February 4, 1988, a letter was received from plaintiffs' counsel noting that there are three RNs and three technicians assigned to the 3:00 p.m. to 11:30 p.m. shift and that no surgery is scheduled during that time. However, Janet Routh also testified:

Q. Is it accurate to state that all scheduled surgery is conducted during the daylight shifts?

A. Yes.

Q. Depending on complications, some scheduled surgery that starts during the

daylight shift might extend into the evening shifts?

A. That's correct.

Q. In a rare instance, it might even extend into the call shift?

A. In a rare instance.

Q. But what we are talking about primarily with the evening shift and virtually exclusively with the call shift is emergency procedures unscheduled?

A. After a certain hour, yes.

(Tr. 23–24). Robert Zomok testified:

Q. There is 100 percent utilization of employees in the operating room theater for all hours of the day other than the on-premises on-call shift?

A. Well, certainly not 100 percent I am sure. I mean people do have to go to the bathroom and they do go to lunch.

Q. And they do stand around and chat for ten, fifteen minutes, have a cup of coffee, sit in the lounge? Those are all activities that can be seen on an almost daily basis in the operating room theater?

A. But on a minimum basis.

Q. On a reduced basis; is that correct?

A. On a minimum basis.

(Tr. 33–34). The testimony of Janet Routh quoted above, compared the work during the productive shifts with that of the "on-premises-on-call" shifts. Plaintiffs have been unable to refer the court to any testimony that plaintiffs' duties during the 3:00 to 11:30 p.m. shift were similar to their work during the "on-premises-on-call" shift —that they were permitted to sleep, watch television, or do whatever they wished as long as they were on the premises. Therefore, they have produced no evidence that they were paid less during their "on-premises-on-call" shifts than they were when they performed the same duties during other shifts.

During oral argument plaintiff's counsel also argued that since the hospital does not schedule surgery for one of its sixteen operating rooms in order to keep that room open for emergencies, the employees assigned to that room are engaged in work

similar to that of plaintiffs during the "on-premises-on-call" shift. However, the testimony very clearly establishes that those employees are kept busy at other duties. See Routh deposition, p. 43–44, quoted above.

There are no genuine issues as to the material facts and plaintiffs have failed to produce evidence that the duties they perform during their non-productive "on-premises-on-call" shifts for which they are paid 1½ times the minimum wage are similar to the duties they perform during the daytime shifts when they are paid a higher rate. Therefore, they have failed to show the defendant has violated the Fair Labor Standards Act, 29 U.S.C. Section 207(a)(1) and it is recommended that plaintiffs' motion for partial summary judgment be denied and that defendant's motion for summary judgment be granted.

In accordance with the Magistrates Act, 28 U.S.C. Section 636(b)(1)(B) and (C), and Rule 4 of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation.